IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DeWAYNE ALTON BANKSTON, AIS #197161, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | CASE NO. 2:14-cv-717-MHT |
| ALA. DEPT. OF CORRECTIONS., *et al.*, | ) ) ) | |
| Defendants. | ) | |

## **RECOMMENDATION OF THE MAGISTRATE JUDGE**[1]

### I. INTRODUCTION

This 42 U.S.C. § 1983 action is before the court on a complaint filed by DeWayne Alton Bankston ("Bankston"), a state inmate, in which he challenges the adequacy of medical treatment provided to him at the Easterling Correctional Facility during 2013 and 2014 for a skin condition. Doc. 1 at 6. Bankston names the Alabama Department of Corrections, Karla Jones, a warden at Easterling during the time relevant to the complaint, and CMS Medical Services, the contract medical care provider for the state prison system.[2] Bankston seeks declaratory and injunctive relief for the alleged violation of his constitutional rights. Doc. 1 at 4. Specifically, Bankston requests issuance "of an

---

[1] All documents and attendant page numbers cited herein by the court are those assigned by the Clerk of this court in the docketing process.
[2] Correctional Medical Services or "CMS" is now known as Corizon, LLC. For purposes of this recommendation and in the interest of clarity, the court will refer to the medical defendant as CMS/Corizon.

1

injunction ordering the Alabama Dept. of Corrections to have [him] taken to see a free world doctor [for treatment]." Doc. 1 at 4.

The defendants filed a special report (Doc. 23) and relevant evidentiary materials in support of their report, including affidavits and certified copies of Bankston's medical records. In the report and affidavits, the defendants deny they acted with deliberate indifference to Bankston's medical needs.

After receipt of the defendants' special report, the court issued an order directing Bankston to file a response to each of the arguments set forth by the defendants in their report, supported by affidavits or statements made under penalty of perjury and other evidentiary materials. Doc. 24 at 3. The order specifically cautioned that "<u>unless within ten (10) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken</u> . . . the court may at any time [after expiration of the time for the plaintiff filing a response] and <u>without further notice to the parties</u> (1) treat the special report and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." Doc. 24 at 4. Bankston filed a response to this order on February 17, 2015. Doc. 26.[3]

Pursuant to the directives of the above-described order, the court now treats the

---

[3] Bankston limits his response to challenging the defendants' argument that he failed to exhaust the administrative remedy provided to him by CMS/Corizon. Doc. 26. Bankston presents inmate request slips and a grievance form in support of his argument that he did, in fact, exhaust the grievance procedure. *See* Doc. 26-1 at 1–8. Upon review of the documents filed by Bankston, the court deems it appropriate to forego any discussion of the exhaustion defense and proceed to the merits of the claims presented in the complaint.

defendants' report as a motion for summary judgment and concludes that summary judgment is due to be granted in favor of the defendants.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam); Fed.R.Civ.P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (holding that the moving party has the initial burden of showing that there is no genuine dispute of material fact for trial). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–24; *Moton v. Cowart,* 631 F.3d 1337, 1341 (11th Cir. 2011) (holding that the moving party discharges his burden by showing that the record lacks

evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial).

The defendants have met their evidentiary burden. Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3); *Jeffery*, 64 F.3d at 593–94 (holding that, once a moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact). This court will also consider "specific facts" pleaded in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014). A genuine dispute of material fact exists when a party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor such that summary judgment is not warranted. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). "[T]here must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Group, Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citation omitted).

Although factual inferences must be viewed in a light most favorable to the plaintiff and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *See Beard v. Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, Bankston's *pro se* status alone does not compel this court to disregard elementary principles of production and proof in a civil case.

The court has undertaken a thorough and exhaustive review of all the evidence contained in the record. After this review, the court finds that Bankston has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the defendants.

### III. DISMISSAL OF DEFENADNT

Bankston names the Alabama Department of Corrections as a defendant in this cause of action. The law is well settled that a state agency or department, as an extension of the State, is absolutely immune from suit for alleged violations of an inmate's constitutional rights. *Papasan v. Allain*, 478 U.S. 265 (1986) (holding that unless the State or its agency consents to suit, the plaintiff cannot proceed against such defendant as the action is proscribed by the Eleventh Amendment and "[t]his bar exists whether the relief sought is legal or equitable"). Consequently, those claims lodged against the Alabama Department of Corrections are frivolous and "based on an indisputably meritless legal theory." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).

## IV. DISCUSSION OF CLAIMS

Bankston complains that from March of 2013 until July of 2014 the defendants acted with deliberate indifference to his complaints regarding a skin condition. Specifically, Bankston alleges that medical personnel failed to provide appropriate treatment to him for this condition and refused his requests for referral to a free-world specialist for treatment. Doc. 1 at 6. Bankston further asserts that he informed Warden Jones of the lack of adequate medical treatment but she refused to intervene in the course of treatment undertaken by medical personnel. Doc. 1 at 6–7.

The defendants adamantly deny that they acted with deliberate indifference to Bankston's medical needs. Instead, the defendants maintain that Bankston had continuous access to health care personnel and received treatment from medical professionals for his skin condition, including examinations by the nursing staff, Doc. 23-2 at 28–30, 32–36, 38–40 & 44–46, evaluations and consultations with Dr. Jean Darbouze, a board certified physician and the Medical Director for Easterling, Doc. 23-2 at 20–26, prescriptions for various medications to alleviate the itching and pain associated with his condition, Doc. 23-2 at 14–18, and a skin culture and punch biopsies on the affected areas to ensure the correct diagnosis, Doc. 23-2 at 15–16, 51 & 56–57. Dr. Darbouze avers that medical personnel evaluated Bankston each time he appeared at sick call with complaints related to his skin condition, assessed his need for treatment, prescribed medications to alleviate the itching and pain associated with his condition, ordered a skin culture and biopsies of the affected areas, and provided treatment to Bankston in accordance with their

6

professional judgment. Doc. 23-1 at 6–12.

To prevail on a claim concerning an alleged denial of medical treatment, an inmate must—at a minimum—show that the defendant acted with deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989). Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (holding, as directed by *Estelle*, that a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment").

As determined by the Supreme Court and the Eleventh Circuit, medical malpractice does not equate to deliberate indifference:

> That medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105–07, 97 S. Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison [medical care provider's] harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S. Ct. 1970, 1977–79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. DeKalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n.28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating

7

> "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to establish "deliberate indifference to [a] serious medical need . . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009). When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (holding that, for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Regarding the objective component of a deliberate indifference claim, the plaintiff must first show "an objectively 'serious medical need[]' . . . and second, that the response made by [the defendants] to that need was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnos[is] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (internal citations omitted). A medical need is serious if it "'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Goebert v. Lee Cty.*, 510 F.3d 1312, 1325 (11th Cir. 2007) (quoting *Hill*, 40 F.3d at 1187).

In addition, "to show the required subjective intent . . , a plaintiff must demonstrate that the public official acted with an attitude of 'deliberate indifference' . . . which is in turn defined as requiring two separate things: 'aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists [] and . . . draw[ing] of the inference[.]'" *Taylor*, 221 F.3d at 1258 (internal citations omitted) (alterations in original). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that a defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore a known risk to that serious condition to warrant a finding of deliberate indifference). Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105, 97 S. Ct. at 291; *Mandel* [*v. Doe,* 888 F.2d 783, 787 (11th Cir. 1989)]. Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers*, 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S. Ct. at 292 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787–88 (mere

> negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258 (citation and internal quotations omitted) (holding that, to show deliberate indifference, the plaintiff must demonstrate a serious medical need and then must establish that the defendant's response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law"). Moreover, "as *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (citation and internal quotations omitted); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that the mere fact an inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Or.*, 662 F.2d 1337, 1344 (9th Cir. 1981) (holding that prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient).

### A. The Correctional Defendant—Warden Karla Jones

Warden Jones submitted an affidavit in her defense, which states in relevant part:

> The Alabama Department of Corrections ("ADOC") contracts with Corizon, LLC to provide health care services to inmates incarcerated at ADOC facilities. All of the individuals who provide medical care to inmates incarcerated at ADOC facilities were at all relevant times employees of Corizon, LLC.
> At no time have I ever been involved in any medical treatment or medical care requested or provided to Mr. Bankston during his incarceration with the ADOC. I have never taken part in any decision related to any health care issues involving Mr. Bankston.
> All medical decisions related to any necessary medical care are and were made by employees of Corizon. All medical decisions related to medical care pertaining to Mr. Bankston would have been made by employees of Corizon and not by me or, to my knowledge, any other employees of the ADOC. . . .

Doc. 23-3 at 1–2.

In the face of this evidentiary showing, Bankston has failed to establish deliberate indifference on the part of Warden Jones. Specifically, Bankston has not demonstrated that this defendant was aware of facts establishing "an objectively serious medical need" or that she disregarded any known serious risk to Bankston's health. *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (holding that, for liability to attach, the official must know of and then disregard an excessive risk of harm to the inmate); *Quinones*, 145 F.3d at 168 (holding that a defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore a known risk to that serious condition to warrant a finding of deliberate indifference); *Farmer*, 511 U.S. at 838 (holding that the failure to alleviate a significant risk that an officer "should have perceived but did not" does not constitute deliberate indifference).

To the extent Bankston seeks to hold Jones liable for the treatment he received from medical professionals employed by CMS/Corizon, he is likewise entitled to no relief because

> [t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. Moreover, "supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care,

*Cameron v. Allen*, 525 F. Supp. 2d 1302, 1307 (M.D. Ala. 2007) (citations and internal quotations omitted). For these reasons, Warden Jones is entitled to summary judgment.

**B.    The Medical Defendant—CMS/Corizon**

The medical defendant submitted the affidavit of Dr. Darbouze and relevant medical records in response to the complaint filed by Bankston.[4] Dr. Darbouze addresses Bankston's allegation of deliberate indifference, in pertinent part, as follows:

> The first indication of any complaint by Mr. Bankston regarding any skin irritation occurred in December of 2012. On December 31, [2012], Mr. Bankston submitted a sick call request form complaining of being "bitten by some insect on my left leg." (COR049). However, Mr. Bankston failed to appear for sick call when summoned for evaluation by the medical staff. (COR012, 049). Mr. Bankston complained of neck and ear pain in a sick call request form on January 3, 2013. (COR046). The medical staff evaluated Mr. Bankston on January 3, 2013, during sick call at which time they noted no redness or bulging or other signs of irritation to Mr. Bankston's neck or ears. (COR047). As indicated through this interaction, it was apparent that Mr. Bankston was not suffering from any type of skin irritation at that time.
> Mr. Bankston next submitted a sick call request form on May 6, 2013, complaining of pain and swelling on his left leg, which he indicated was spreading. (COR045). Despite not mentioning any specific rash or

---

[4] Dr. Darbouze cites to the medical records throughout his affidavit. The citations set forth in his affidavit reference the page numbers assigned these documents by the medical care provider.

discoloration in his sick call request form, the medical staff evaluated Mr. Bankston during sick call on May 6, 2013, and noted two red bumps to his lower left leg, which were swollen and painful to the touch. (COR043). At that time, the medical staff who evaluated Mr. Bankston during sick call referred him to me for further evaluation. (COR044). I first saw Mr. Bankston at this time for evaluation of his skin rash and skin irritation. (COR020-21). I initially evaluated Mr. Bankston on May 7, 2013. (COR020). After conducting this initial evaluation, Mr. Bankston's rash appeared to be the result of an infection and I entered orders for him to receive the antibiotic Bactrim, as well as Tylenol, for discomfort. (COR016). The medical staff confirmed this diagnosis the following day when we received the results of a wound culture sample collected from Mr. Bankston, which demonstrated a positive growth for staphylococcus aureus. (COR056). At the conclusion of this appointment, I instructed the medical staff to schedule a follow-up appointment for Mr. Bankston in approximately one week. (COR016).

I next evaluated Mr. Bankston on May 14, 2013, at which time I noted that his skin irritation had improved and appeared to be responding favorably to the antibiotic regimen prescribed for him; however, my examination did reveal some indication that his rash was likely secondary to some other type of skin irritation. (COR021). After discussing Mr. Bankston's symptoms with him and in light of the treatment provided, Mr. Bankston appeared very anxious about the degree of itching he was experiencing. Therefore, at the conclusion of the May 14, 2013 appointment, I entered a prescription for Mr. Bankston to receive Vistaril in order to combat his anxiety and skin discomfort. (COR016). I also prescribed Mr. Bankston with a topical steroid. (COR013-016). Since May of 2013, Mr. Bankston has continually been prescribed Vistaril and a topical steroid; however, he has routinely failed to take or use these medications as prescribed.

Mr. Bankston submitted a sick call request form on June 12, 2013, complaining of a rash breaking out on both of his legs; however, he failed to appear for sick call when summoned for evaluation. (COR041-42). Mr. Bankston submitted another sick call request form on June 15, 2013, at which time he complained of a rash on both of this legs, but again, failed to appear for sick call. (COR009, 40). Mr. Bankston submitted a third sick call request form on June 19, 2013, complaining of itching sores on his legs that were spreading to both legs. (COR039). The medical staff evaluated Mr. Bankston during sick call on June 19, 2013, at which time he complained of the rash on his legs and that "none of the creams/medications were helping." (COR037). The medical staff referred Mr. Bankston to me for further evaluation.

13

I next evaluated Mr. Bankston on June 27, 2013, at which time I informed him that, based upon his symptoms and my evaluations of him over the last few weeks, I believed he was suffering from a condition known as lichen simplex chronicus. (COR022). Lichen simplex chronicus is a skin condition resulting from chronic itching or scratching of the skin. While lichen simplex chronicus is typically found with people suffering from eczema or psoriasis, Mr. Bankston suffers from neither of these symptoms. His lichen simplex chronicus is the result of chronic itching which has become somewhat habitual as a result of some sort of nervous tick or anxious movement undertaken by Mr. Bankston when he is under stress or anxious. The frustrating aspect of lichen simplex chronicus is that the condition itself actually leads to additional itching. The chronic scratching of the skin causes the skin to thicken and, as the skin thickens, it becomes leathery and brownish in the problem[] areas which can result in this additional itching. Lichen simplex chronicus is typically diagnosed through a skin lesion biopsy or punch biopsy. Treatment for lichen simplex chronicus typically involves the use of some topical lotion and/or steroidal cream in order to calm the itching or discolored areas, as well as oral medications (typically, an antihistamine such as Benadryl or Vistaril).

During the June 27, 2013, appointment, I informed Mr. Bankston that we would be required to conduct a punch biopsy in order to confirm this diagnosis. Mr. Bankston underwent a punch biopsy of the rash on his left leg that same day, June 27, 2013. (COR055). The results of the punch biopsy confirmed my initial diagnosis of lichen simplex chronicus. (COR055).

On August 13, 2013, Mr. Bankston attended a follow-up appointment with me at which time his condition appeared mostly unchanged. (COR022). During the course of the appointment, I examined the areas which appeared to be affected by his lichen simplex chronicus. Mr. Bankston and I discussed the condition and the confirmatory punch biopsy and I emphasized to him the importance of taking his medications which should alleviate his symptoms to some degree, if he followed my orders regarding his medications.

Mr. Bankston next submitted a sick call request form dated September 27, 2013, at which time he complained of skin irritation on his legs and arms that began on his left leg and moved to his arms. (COR036). However, he failed to appear for sick call on September 27, 2013. (COR008). Mr. Bankston submitted another sick call request form on September 28, 2013, at which time he continued to complain of a rash, although he noted that he had received an antibiotic but still wanted to see a "dermatologist, or someone that will find out what this is and help me." (COR035). Given the nature of his request, the medical staff scheduled

another follow-up appointment for Mr. Bankston with me.

I next met with Mr. Bankston on October 7, 2013. (COR023). At that time, he continued to complain of his symptoms and the treatment prescribed for him, though he had routinely failed to appear to receive the medication prescribed for him. He expressed frustration over the nature of the diagnosis. At the conclusion of this appointment, I provided Mr. Bankston with orders for Vistaril and a topical steroid in order to treat his symptoms. (COR015).

I next evaluated Mr. Bankston on October 21, 2013, at which time we again discussed his diagnosis and his concerns regarding his condition. (COR023). In hopes of alleviating his concerns regarding our diagnosis and in order to rule out any other possible causes, I agreed to repeat the punch biopsy and entered orders to that effect at the conclusion of this appointment. (COR015).

Mr. Bankston signed an informed consent for medical services form on October 28, 2013, providing his written consent for the medical staff to perform a punch biopsy with respect to the areas of skin irritation identified through an examination by the medical staff. (COR006). At that time, Mr. Bankston underwent a punch biopsy of his right elbow and right leg. The pathology report from the punch biopsy again confirmed the diagnosis of lichen simplex chronicus to Mr. Bankston's right leg. The sample from his right elbow simply came back as inflamed tissue and/or dermatitis. (COR051). Mr. Bankston was informed to return to the healthcare unit at approximately 5:00 am and 5:00 pm every day for treatment call where he would receive a topical treatment for his skin irritation. (COR007). I again met with Mr. Bankston [later on October 28, 2013 to] follow-up [with him regarding the] punch biopsy . . . , which he appeared to tolerate well, and I informed Mr. Bankston that we would notify him if the punch biopsy revealed any different condition [than that previously diagnosed]. (COR024).

When I next met with Mr. Bankston on November 25, 2013, we again discussed his condition as well as the treatment plan for his condition and the results of the prior punch biopsy, which had confirmed my prior diagnosis. (COR024).

I next evaluated Mr. Bankston on January 24, 2014, at which time I strongly advised him to take whatever steps were necessary in order to alleviate his anxiety and to reduce his scratching, which was simply making his condition worse. (COR025). As of that date, I also noted Mr. Bankston's non-compliance with the medications prescribed for him and again encouraged him to ensure that he received and took his medications at the times indicated for pill call. (COR025).

> On April 6, 2014, Mr. Bankston submitted a sick call request form complaining of a patchy rash on his legs which was irritating, and noted that I previously ordered a skin biopsy. At the end of the sick call request form dated April 6, 2014, Mr. Bankston requested the opportunity to see a "specialist." (COR027). Mr. Bankston was evaluated during sick call on April 7, 2014, by a member of [Easterling's] medical staff. (COR028-29). At that time, we elected to continue the course of treatment for Mr. Bankston's condition. In fact, since April of 2014, Mr. Bankston has continued to receive orders for medications to treat his condition, though he refuses to accept my diagnosis or follow the treatment regimen I prescribed for him. (COR013-15).
>
> As indicated in Mr. Bankston's medication administration records, he routinely failed to appear for pill call to receive the Vistaril and/or the steroidal topical treatment to treat his complaints of itching. (COR063-77). For example, during the month of January, 2014, Mr. Bankston did not appear on one occasion at either 4:00 am or 4:00 pm to receive his Vistaril. (COR063).
>
> I did not at any time ignore any request by Mr. Bankston for medical treatment. I did not deliberately ignore any medical complaints made by Mr. Bankston or interfere in any way with the provision of medical care to him at any time. I did not take any action which has caused Mr. Bankston to experience any unnecessary pain and/or suffering. I did not unnecessarily or inappropriately delay in any way in providing him with any treatment. . . .

Doc. 23-1 at 6–12 (internal paragraph numbering omitted).[5]

Under the circumstances of this case, the court concludes that the course of treatment undertaken by Dr. Darbouze did not violate Bankston's constitutional rights. Specifically, there is no evidence upon which the court could conclude that Dr. Darbouze or any other member of the medical staff at Easterling acted in a manner that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505. Rather, the evidence

---

[5] The affidavit submitted by Dr. Darbouze is corroborated by the objective medical records contemporaneously compiled during the treatment process.

before the court demonstrates that medical personnel, including the nursing staff and Dr. Darbouze, examined Bankston for his complaints of skin irritation, prescribed medications to Bankston in an effort to treat his condition, and ordered a skin culture and biopsies of the affected areas to aid in diagnosing the condition. Whether Dr. Darbouze "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal citation omitted). In addition, to the extent Bankston complains that Dr. Darbouze did not diligently pursue alternative means of treating his condition, this allegation does not "rise beyond negligence to the level of [deliberate indifference]." *Howell v. Evans*, 922 F.2d 712, 721 (11th Cir. 1991); *Hamm*, 774 F.2d at 1505 (holding that inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (holding that simple divergence of opinions between medical personnel and the inmate-patient do not violate the Eighth Amendment).

As a result, the court concludes that the alleged lack of treatment did not constitute deliberate indifference. Bankston's self-serving statements of a lack of due care and deliberate indifference do not create a question of fact in the face of contradictory, contemporaneously created medical records. *Whitehead*, 403 F. App'x at 403 (11th Cir. 2010); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling

on a motion for summary judgment."); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253–54 (11th Cir. 2013) (same). In addition, Bankston has failed to present any evidence showing that the manner in which the medical staff addressed his condition created a substantial risk to his health that Dr. Darbouze or the attending nurses consciously disregarded. The record is therefore devoid of evidence—significantly probative or otherwise—showing that Dr. Darbouze or any other health care provider acted with deliberate indifference to a serious medical need experienced by Bankston. Consequently, summary judgment is due to be granted in favor of defendant CMS/Corizon.

## V. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The defendants' motion for summary judgment (Doc. 23) be GRANTED.

2. Judgment be GRANTED in favor of the defendants.

3. This case be DISMISSED with prejudice.

4. The costs of this proceeding be taxed against the plaintiff.

It is further ORDERED that on or before **May 3, 2017** the parties may file objections to this recommendation. A party must specifically identify the factual findings and legal conclusions in the recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's recommendation shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive

the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 19th day of April, 2017.

                      /s/ Gray M. Borden
              UNITED STATES MAGISTRATE JUDGE